(August 8, 1996)

■ SCUPELLA BELL, Respondent, v BOARD OF EDUCATION OF THE CITY OF NEW YORK, Appellant. [646 NYS2d 499] —Judgment, Supreme Court, Kings County (Randolph Jackson, J.), entered on or about October 17, 1994, which, after a jury trial, awarded plaintiff $2,250,000, reversed, on the law, without costs, and the complaint dismissed.

This action for damages arises from the rape of plaintiff Scupella Bell, then a twelve-year-old schoolgirl, by acquaintances John Gibson and Chivelle Stallworth on June 3, 1988. On that day, plaintiff and her class were conducting school activities at a park located several blocks from her school. Plaintiff left the park at noon to lunch at a nearby pizza shop. Plaintiff's teacher noted her absence during a head-count at the designated departure time of 12:30, waited and searched the park for her in vain for thirty minutes, and visited plaintiff's home, located several blocks from the park, before returning to school. When plaintiff returned to the park and discovered that her class had returned to school, she decided to return home instead. Meeting Gibson and Stallworth on this brief journey, she accompanied them for 30 to 45 minutes, by her testimony under duress, to Stallworth's house, where the rape occurred.

Plaintiff sued the Board of Education of the City of New York for damages arising from the rape, claiming that it had failed in its duty to supervise her during a school activity. Following trial, a jury found plaintiff 25% liable and the Board 75% liable for plaintiff's injuries, and assessed total damages of $3 million. The Board appealed.

We reverse. While we have grave doubts about the jury's

finding that the Board failed in its duties of supervision in this case, we need not decide that issue. Even assuming such a failure, the unforeseeable criminal conduct of Gibson and Stallworth constituted a superseding tortious act that absolved the Board of any culpability for plaintiff's injuries (*Mirand v City of New York*, 84 NY2d 44, 49-50). Concur—Murphy, P. J., Ross and Tom, JJ.

Mazzarelli, J., dissents in a memorandum as follows: This appeal concerns the liability of the Board of Education of the City of New York ("the Board") for its failure to adequately supervise a sixth grader during a school outing. A jury found that as a consequence of the Board's negligent supervision, plaintiff left the grounds of a park her class was visiting and went to a nearby pizzeria to purchase pizza. Upon leaving the pizza shop, plaintiff was accosted and then raped by two boys. As a consequence of the rape, plaintiff has suffered significant psychological harm that, among other things, has manifested itself in the form of more than one attempted suicide. After being properly charged on the legal definitions of negligent supervision, proximate cause, foreseeability, intervening causation, and comparative negligence, the jury found that defendant's negligent supervision was a proximate cause of plaintiff's injuries, and that this harm was a reasonably foreseeable consequence of the Board's negligence. The jury awarded plaintiff $3 million in damages for past and future pain and suffering, which was reduced to $2.25 million, to reflect the allocation of comparative fault between the plaintiff and defendant.

The majority reverses the judgment on the grounds that, as a matter of law, the criminal conduct of the rapists was unforeseeable. However, in my view, this issue was placed squarely before the jury, which, after proper instruction on the law of intervening causation, resolved this question in plaintiff's favor. As the jury's verdict is neither based on legally insufficient evidence nor against the weight of the evidence in the record, it should not be disturbed. Accordingly, I dissent.

On June 3, 1988, plaintiff, who was then a 12-year old sixth grader, along with her classmates, attended a special drug awareness program organized by the Police Department. The program consisted of street fair-type activities at scattered sites throughout the grounds of a park near the plaintiff's school and home. Before leaving school for the park on the day of the trip, the plaintiff's teacher told his class to be on their

best behavior and to meet him at the park entrance when it was time to return to school.[1]

There was evidence adduced on plaintiff's case at trial that at some point on the day of the incident, plaintiff asked for and received permission from her teacher to leave the park and go to a nearby pizzeria with some classmates. Although the class was in the park during the 11:15 to 12:15 lunch period, plaintiff's teacher could not recall whether lunch was provided or whether the students brought their own lunch. He was "not sure" if he had given the class any instructions as to whether they could leave the park and was "not sure" whether plaintiff or any of the other students had asked for permission to go to the pizzeria across the street. Plaintiff's teacher denied that he would have permitted them to do so and was "not sure" whether plaintiff ever told him she was leaving. He also was "not sure" whether any of the other teachers gave permission to their students to leave the park grounds.

When it was time to leave the park, the teacher took a head count and determined that plaintiff was missing; one of the students, who testified at trial for defendant, told him that plaintiff had left the park, although the teacher was "not sure" whether the student told him when or where plaintiff went or whether it was in the company of others. From approximately 12:30 to 1:00 P.M., the teacher looked for plaintiff within the confines of the park. He did not ask any of the students for plaintiff's whereabouts and did not inform any of the other teachers or the police officers on duty in the park that she was missing. As they were leaving the park to return to school, one of the students did, however, approach a police car to mention that a girl was missing, and the plaintiff's teacher also "mentioned it" to the police.

According to plaintiff, sometime between 12:50 and 1:00 P.M., another student came to the pizza shop and said that their class had left the park, whereupon plaintiff returned to the park, did not see her class, returned to the pizza shop for five minutes, and then left to go home.

Plaintiff's teacher testified that, while returning to school with his class, he stopped at plaintiff's house to inform her mother that plaintiff was missing and to inquire whether she had already returned home. Concerned about her daughter's whereabouts, plaintiff's mother went to the school and the surrounding area, including the park, to look for plaintiff. She

---

1. Plaintiff's teacher died before the jury trial of this matter commenced; thus, his testimony from his examination before trial was read into evidence at trial.

then went home and thereafter returned to the school at regular dismissal time (2:50 P.M.), as was her daily habit, to pick her daughter up from school and escort her home. Although she saw her daughter's class, plaintiff's mother did not see her daughter or the teacher. Upon returning home again, plaintiff's mother telephoned the school and spoke to two individuals. According to plaintiff's teacher, when he returned to the school, he did not orally report to either the principal or the assistant principal that plaintiff was missing and he was "not sure" whether he ever filed a written report of the incident.

Meanwhile, at about 1:15 or 1:30 P.M., as plaintiff was walking alone about a block from the park, John Gibson and Chivelle Stallworth, along with a third boy who left soon after, approached her and stated to plaintiff that they would "F [her] up" if she ran. Plaintiff had previously encountered Gibson because he attended the intermediate school that was located in very close proximity to her elementary school. Contrary to the evidence adduced on the defendant's case from one of plaintiff's classmates, plaintiff denied ever having been Gibson's girlfriend.[2]

Plaintiff testified that as she continued to walk, Gibson and Stallworth were pulling on her clothes, pulling her hair and would not let her go. After a walk of 30 to 45 minutes, they arrived at a house, which plaintiff later learned to be Stallworth's. The two boys fondled plaintiff; one held her hands while the other removed her clothing, which was then hidden. Gibson and Stallworth then proceeded to rape plaintiff. After about two and one-half hours, plaintiff was permitted to leave. Upon returning home, plaintiff appeared to her mother to be upset and, upon questioning, related what had transpired. The plaintiff's mother reported the rape to the police, who subsequently interviewed plaintiff, conducted a physical examination of plaintiff, and then drove plaintiff and her mother around the area in a radio motor patrol car. First Gibson and

---

2. On defendant's case, the Board also called a teacher, who was not plaintiff's teacher, but who was also on the school trip. He testified that he left the school after dismissal, at about 3:30 P.M. As he was bicycling home, he rode past plaintiff and saw her at a distance of about 12 feet on the sidewalk with two boys whom he did not know. She appeared casual, as if the three were friends; she did not appear frightened, and neither her hair nor her clothing was in disarray. The boys were not hovering over her in a malicious manner, and did not appear to be restraining her or touching her with their hands. This teacher did not call the school because he concluded that plaintiff had merely "cut" school as children sometimes do, believing that plaintiff had left the park of her own free will. According to this witness, had plaintiff appeared to be in distress, he would have intervened.

then Stallworth were arrested, the latter having voluntarily surrendered himself to the police. Both Gibson and Stallworth were subsequently convicted of rape in the first degree upon their guilty pleas.

As a consequence of the rape, plaintiff has suffered significant emotional difficulties as evidenced by more than one attempted suicide, admission to an adolescent psychiatric ward, problems in school, substance abuse, involvement in criminal activity which resulted in an adjudication as a Person in Need of Supervision, and admission to residential substance abuse programs. Since the rape occurred, plaintiff carries a razor blade for self-defense, and she suffers from nightmares and troubled sleep. According to the testimony of plaintiff's expert psychiatric witness, plaintiff is suffering from permanent post-traumatic stress disorder.

At trial, there was also considerable evidence adduced concerning the defendant Board of Education's policies for class outings and what constitutes adequate supervision. In order to establish the applicable standard of care, plaintiff called an expert witness, whose testimony the defendant unsuccessfully sought to preclude on the ground that the standard of care (to act as a reasonable and prudent parent would in the same circumstances) was within the ken of the ordinary juror and therefore not a proper subject of expert testimony. Plaintiff's expert witness had 43 years of experience as a teacher and principal, and taught courses in supervision and administration. There was no challenge to his qualification as an expert.

Based on his review of the deposition transcripts of plaintiff's teacher, another teacher who was on the school outing, plaintiff and plaintiff's mother, the expert witness opined that defendant had departed from "safe and common practices." Among other things, the plaintiff's expert testified as to what would have constituted proper supervision, including: requiring at least one other parent with a group of 30 students; pairing the students off, as "buddies"; arranging with the class to meet every hour in the park; making clear that no student could leave the park; and informing the class that the school would be the only point of dismissal. According to the expert witness, once plaintiff's teacher learned that plaintiff was missing, he should have undertaken several steps, including: notifying the school immediately to seek guidance from his superiors; notifying the police in the park; asking another teacher to take his students back to the school, so that he could continue to search for plaintiff; remaining in the park with his class until

shortly before dismissal time, in order to give plaintiff more time to return; and notifying school personnel when he returned that plaintiff was still missing.

The prior deposition testimony of plaintiff's teacher was read to the jury and established that, although there were faculty-administration meetings at which school rules and regulations were discussed, he did not recall anything being said about class trips and was "not sure" that he was told anything about class trips other than that parental consent was required. He was "not sure" whether he had received any rules or guidelines from the school or from the Board of Education as to what to do if a child was missing.

Another teacher, who was also on the school outing, testified at trial on defendant's case that the teachers were required to brief the students on the rules for the trip prior to any field trip. For this trip in particular, students were not permitted to leave the park, and dismissal was to take place from the school in accordance with a "strict policy" prohibiting dismissal from other locations. This witness knew that plaintiff was missing and confirmed that plaintiff's teacher had searched the park, but had no knowledge of which individuals plaintiff's teacher had spoken with or the time frames involved.

On appeal, the Board's principal contention is that it did not breach its duty of adequate supervision and that, even if it did, such breach was not a proximate cause of plaintiff's injury. The defendant also argues that the trial court's admission of expert testimony on the standard of care constituted reversible error. Finally, defendant argues that even if the jury's finding of liability is upheld, the damages award must be set aside as excessive.

Although acknowledging that it harbors "grave doubts about the jury's finding that the Board failed in its duties of supervision in this case," the majority purports not to reach this issue, because, in its view, as a matter of law, the criminal conduct of the two rapists was "unforeseeable criminal conduct" that "constituted a superseding tortious act that absolved the Board of any culpability for plaintiff's injuries." Left unstated in the majority memorandum is that its reversal of the judgment is tantamount in effect to granting a motion to set aside the verdict of the jury as being based on legally insufficient evidence, or in the alternative as being against the weight of the evidence. The issue of whether the rape of plaintiff was a foreseeable consequence of defendant's negligence or an intervening cause absolving defendant of liability is one which was placed before the jury in this case. Unless the majority is pre-

pared to hold that, as a matter of law, a criminal act will always operate to break a causal chain of events, to grant either of such motions, upon this record, would constitute, in my view, an unjustifiable intrusion on the "province of the jury to disbelieve the defense testimony" (*Rizos v New York City Hous. Auth.*, 226 AD2d 323, 323-324) and to resolve disputed questions of fact.

It is, of course, well-settled law that on a challenge to the sufficiency of a verdict in favor of plaintiff, the evidence in support thereof must be accepted as true and viewed in the light most favorable to the plaintiff (*Mirand v City of New York*, 190 AD2d 282, 287, *affd* 84 NY2d 44; *Curiale v Peat, Marwick, Mitchell & Co.*, 214 AD2d 16, 18). For defendant to prevail on such a motion, there must be no valid line of reasoning and permissible inferences which could possibly lead rational persons to the conclusion reached by the jury on the basis of the evidence presented at trial (*Mirand v City of New York*, supra, at 48-49; *Cummins v County of Onondaga*, 84 NY2d 322, 325-326; *Campbell v City of Elmira*, 84 NY2d 505, 509). Thus, notwithstanding the assertion by the majority to the contrary, we must necessarily consider whether the record contains sufficient evidence that would have allowed a jury of rational persons to conclude that the defendant violated its duty to supervise.

A school's duty to supervise its students arises out of its assuming custody of the children it teaches. The duty has most recently been set forth in *Mirand* (supra, at 49): "Schools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision (*see, e.g.*, *Lawes v Board of Educ.*, 16 NY2d 302, 306; *Decker v Dundee Cent. School Dist.*, 4 NY2d 462, 464). * * * The nature of the duty owed was set forth in the seminal case of *Hoose v Drumm* (281 NY 54, 57-58): '[A] teacher owes it to his [or her] charges to exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances.' The duty owed derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians (*see, Pratt v Robinson*, 39 NY2d 554, 560)."

As every first year law student who has studied *Palsgraf v Long Is. R. R. Co.* (248 NY 339) and its progeny has learned, liability for breach of a duty owed by one party to another attaches only when the harm to be guarded against is foreseeable. "The test of actionable negligence is what a reasonably

prudent and careful person would have done under the circumstances in discharge of his [or her] duty to the injured person and does not embrace the failure to guard against a remote possibility of accident or one which could not in the exercise of reasonable care have been foreseen. * * * Only reasonable foresight and not prophetic vision is required." (*Luce v Hartman*, 5 AD2d 19, 21, *revd* 6 NY2d 786.) Thus, the majority correctly states the law when it states that "unforeseeable criminal conduct" cannot serve as a basis for the imposition of liability. Where I disagree with my colleagues is in their readiness to cast aside the jury's determination that to prevent what occurred here did not require "prophetic vision", but rather merely the exercise of reasonable foresight.

In addition to defining negligence and the Board of Education's duty to provide adequate supervision, the trial court instructed the jury on the issues of proximate cause, foreseeability and intervening causation in accordance with the New York Pattern Jury Instructions for civil cases. Specifically, the trial court instructed the jury as follows:

"Negligence requires both a foreseeable danger of an incident and conduct which is unreasonable in proportion to the danger. A person is not responsible for the consequences of their conduct unless the risk of an incident was reasonably foreseeable. The exact occurrence or precise incident need not have been foreseeable, but an incident as a result of negligent conduct must have been not merely possible, but probable.

"If a reasonably prudent person could not foresee any incident as a result of their conduct or if their conduct was reasonable in the light of what they could foresee, then there was no negligence. On the other hand, there was negligence if a reasonably prudent person could foresee an incident as a result of their conduct and if the conduct was unreasonable in the light of what they could foresee. * * *

"An act or omission is a proximate cause of an incident if it was a substantial factor in bringing about that incident. That is, if it had such an effect in producing the incident that reasonable people would regard it as a cause of the incident. * * * [The court repeated its definition of proximate cause.]

"If you find that the Board of Education was negligent, but that [plaintiff's] injuries were caused by the act of someone else, such as the rapist, the Board of Education may be held liable for those injuries if you further find that a reasonably prudent person situated as the Board of Education was prior to the happening of the incident, would have foreseen an act of the kind committed by the rapists as a probable consequence of the Board of Education's negligence.

"If your finding is that a reasonably prudent person would not have foreseen an act of the kind committed by the rapists as a probable consequence of the Board of Education's negligence, then the Board of Education is not responsible for [plaintiff's] injuries and your verdict must be for the Board of Education."

The trial court also explained the applicable principles of law governing the Board's responsibility for the acts and omissions of its employees, as well as the law of comparative negligence. It should be underscored that the adequacy of the trial court's instructions is not challenged on this appeal.

In finding for plaintiff, the jury's responses to the interrogatories in the special verdict make clear that it found that the rape of plaintiff was proximately caused by defendant's failure to adequately supervise as a prudent and reasonable parent would have under similar circumstances, and that this incident was a foreseeable consequence of the defendant's negligent supervision. While reasonable parents might differ as to whether it would be appropriate to permit a 12 year old to go unsupervised in an urban area to a pizzeria for lunch during a school outing, and as to whether, in so doing, one subjects that child to a foreseeable risk of violent crime, as occurred here, the members of the jury clearly found that the Board's employees did not act as a prudent and ordinary parent ought. Although jury verdicts are not sacrosanct, an appellate court should proceed cautiously when reversal is, notwithstanding the majority's characterization of its reversal as being on the law, premised on such factually driven matters. Proximate cause and intervening cause are generally issues to be decided by the trier of fact (*see*, *Mirand v City of New York*, 84 NY2d, *supra*, at 51; *but cf.*, *Rodriguez v New York City Hous. Auth.*, 87 NY2d 887). Here, in reversing the judgment, the majority substitutes its notion of a prudent and ordinary parent and of what is reasonably foreseeable for the standard which was properly explained by the Trial Judge using the New York Pattern Jury Instructions for civil matters and then applied by the jury as trier of fact to the case at bar. In so doing, the majority points to no error in the legal instructions, and thus usurps the jury's role as trier of fact.

Unspoken in the majority's expression of "grave doubts" as to the jury's finding that defendant was negligent in its supervision of plaintiff, is the credence it places in the defendant's argument on appeal that it is "difficult to believe" that the plaintiff's teacher gave her permission to leave the park and that the Board did not have the opportunity to prevent

plaintiff's misconduct because she intentionally evaded school personnel. This argument by the defendant, and its *sub silentio* adoption by the majority, ignores the role of the jury in assessing credibility and resolving factual disputes. It also disregards the well-settled principle of law, set forth above, that in considering whether to set aside a verdict on sufficiency grounds the prevailing party is entitled to every favorable inference, and such motion may only be granted when there is *no* valid line of reasoning to support the jury's verdict. Because the jury's verdict in this matter was not "utterly irrational" given the evidence, it should not be set aside for legal insufficiency (*Hoffson v Orentreich*, 168 AD2d 243, 245).

Nor was the jury's verdict against the weight of the evidence. "When weight of evidence is the issue, a verdict for the plaintiff may not be disregarded unless the evidence so preponderates in favor of the defendant that it could not have been reached on any fair interpretation of the evidence" (*O'Boyle v Avis Rent-A-Car Sys.*, 78 AD2d 431, 439; *see also, Lolik v Big V Supermarkets*, 86 NY2d 744, 746). Again, while reasonable parents might differ as to the degree of responsibility to be entrusted to a sixth grader and as to the flexibility that should be used in supervising preteen students as compared to younger students, the evidence at trial did not so preponderate in defendant's favor on this, or any other contested issue, including the question of foreseeability, such that it can be said that it was unreasonable for the jury to have interpreted the evidence in a manner favorable to plaintiff. "Proper supervision depends largely on the circumstances surrounding the event" (*Mirand v City of New York, supra*, at 51), and the jury was free to accept plaintiff's version of events and plaintiff's expert witness' version of what constituted reasonable supervision. Moreover, that the jury chose to do so is hardly surprising given the equivocal answers of plaintiff's teacher on the critical issues of what supervision he actually provided and in light of the glaring lacuna in defendant's case of countervailing evidence of what would constitute reasonable supervision on this field trip. Finally, even if the majority is correct to the extent that it finds that the verdict should be set aside as contrary to the weight of the evidence pursuant to CPLR 4404 (a), the appropriate remedy is to remand the matter for a new trial, not dismissal of the plaintiff's complaint (*Sage v Fairchild-Swearingen Corp.*, 70 NY2d 579, 588).

Defendant's argument that the admission of the testimony of plaintiff's expert witness on supervision and security issues constituted reversible error lacks merit. Such an evidentiary

ruling is a matter best addressed to the sound discretion of the trial court. Expert testimony is appropriate when it helps to clarify an issue calling for professional or technical knowledge beyond the ken of the typical juror (*People v Hill*, 85 NY2d 256, 261; *Gomez v New York City Hous. Auth.*, 217 AD2d 110). Here, although the general standard for supervision, the prudent parent under the circumstances, was within the comprehension of a layperson, the trial court's finding that the precise type of supervision needed for field trips required expertise did not constitute an abuse of discretion. This is true despite the fact that some of the expert's guidelines were no more than common sense and the thrust of the expert's testimony herein was the custom and usage within the schools, which was admissible, although not necessarily conclusive, to show the standard of care (*see, Trimarco v Klein*, 56 NY2d 98, 105-107; *Guldy v Pyramid Corp.*, 222 AD2d 815). The jury was properly instructed on how to evaluate expert testimony and that it need not accept an expert's testimony as conclusive.

Finally, defendant's argument that the damages award was excessive is unpersuasive. The amount awarded does not materially deviate from what would constitute reasonable compensation under the circumstances (CPLR 5501 [c]). As with credibility in general (*Vavosa v Stiles*, 220 AD2d 363, 364), in arriving at the award, the jury was free to accept the opinion of plaintiff's psychiatric medical expert, which was substantiated in part by plaintiff and her mother, and to reject the opinion of the defense expert as to the extent and permanency of plaintiff's emotional injuries (*see, Banayan v Woolworth Co.*, 211 AD2d 591; *see also, Splawn v Lextaj Corp.*, 197 AD2d 479, *lv denied* 83 NY2d 753 [$1.8 million for *past* pain and suffering in rape case]).

Accordingly, the judgment entered in plaintiff's favor upon the jury's verdict should be affirmed.